UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>v.<br><br>CHRISTOPHER L. ASBURY,<br><br>                              Defendant. | Case No. 2:19-cr-20061-CSB-EIL<br><br>Honorable Colin S. Bruce |

## CHRISTOPHER L. ASBURY'S SENTENCING MEMORANDUM

Defendant Christopher Asbury will appear before this Court for resentencing under a *significantly* different record than when he was first sentenced. The offense conduct now correctly concerns only a single transaction of 82.2 grams of methamphetamine and not the allegations of relevant conduct that were previously used to enhance Mr. Asbury's offense level calculation. Mr. Asbury's criminal history computation now correctly reflects 21 points—7 of which relate to driving offenses—and *not* the 34-point computation pursuant to which the Court was previously asked to sentence him. It is thus now undisputed that Mr. Asbury's Sentencing Guidelines range has been reduced to 210–262 months—far below the range of 360 months to life that served as the backdrop to his initial sentencing.

Additionally, the Government has indicated it will move to withdraw its Section 851 notice. As a result, the minimum sentence applicable in this case is now ten years—*not* the fifteen-year minimum sentence previously assumed. And finally, the Court now has the more developed record of Mr. Asbury's familial and community involvement, his post-sentencing rehabilitation efforts, and his good behavior and proactive self-improvement—all substantial mitigating factors that justify a sentence that is below the Guidelines range.

These changed circumstances, taken together, support a substantially different approach to sentencing Mr. Asbury and a substantially lower sentence than the one previously imposed. Thus, for the reasons stated herein, Mr. Asbury respectfully submits that a sentence of a term of incarceration of 150 months is sufficient, but not greater than necessary, to achieve the goals of sentencing.

I. The Legal Standards Governing Sentencing

It has long been "the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Following the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Court has significant freedom to fashion a sentence that considers the unique circumstances of each defendant, his conduct, its import, and its place in time, not simply the Guidelines calculation applicable to his offense.

Consistent with this tradition of individualized justice, this Court should look beyond the narrow bandwidth of the applicable Guidelines range and thoughtfully and carefully consider each of the individualized sentencing considerations set forth in Section 3553(a) to fashion a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. 18 U.S.C. § 3553(a). This directive—that a sentence should be what is *minimally necessary* in each individual case—necessitates an understanding of the *individual* as well as his conduct before sentence is imposed. This includes not just an evaluation of offense conduct, but an assessment of the person he was, is, and still can become. This inquiry includes a review of Mr. Asbury's conduct after his initial sentencing in this case—*i.e.*, evidence of his contrition and post-sentencing rehabilitation. *See Pepper v. United States*, 562 U.S. 476, 505 (2011).

In light of these bedrock principles, Mr. Asbury offers the following insight into himself, his actions, and their impact under the rubric of Section 3553(a)'s applicable sentencing factors.

## II. The Correct Guidelines and Statutory Ranges Represent a Substantial Reduction from Mr. Asbury's Prior Sentencing

The evaluation of Mr. Asbury necessitates the acknowledgement of his prior sentencing in this case. At that initial sentencing, Mr. Asbury was sentenced to 360 months' incarceration based on unsubstantiated allegations of relevant conduct and an improperly calculated criminal history. *See* D.E. 60, ¶¶ 14–16, 24. Now, correctly recalibrated, the agreed-upon Guidelines range for Mr. Asbury's resentencing is 210–262 months. *See* 3d Revised Presentence Report ("PSR"), D.E. 82, ¶ 96. Further, the Government's decision to withdraw its Section 851 notice in this case reduces the minimum sentence to only ten years.[1] *See id.* ¶¶ 10, 95.

These substantial changes in the applicable advisory Guidelines calculation and statutory minimum, combined with the evidence of Mr. Asbury's post-sentencing conduct and rehabilitation, reflect that a lower sentence of 150 months is sufficient but not greater than necessary to achieve the Court's sentencing goals.

## III. A Sentence of 150 Months' Imprisonment is Appropriate.

### A. The Nature and Circumstances of the Offense Are Serious—But Limited.

Mr. Asbury has been convicted of a single, street-level drug sale in which he sold 82.2 grams of methamphetamine to a Government Confidential Source. *See* PSR ¶ 14. The PSR acknowledges that there is no identifiable victim of the offense. *Id.* ¶ 16. Although Mr. Asbury

---

[1] As set forth Mr. Asbury's Objections to the Second Revised PSR, the Government's decision to withdraw its Section 851 notice is consistent with recent court decisions indicating that the relevant offense of conviction upon which the Government had sought to rely did not constitute a "serious drug felony" under 21 U.S.C. § 802(57), 18 U.S.C. § 924(e)(2), and 21 U.S.C. § 841(b)(1)(A). *See United States v. Johnson*, No. 17-CR-00770, 2021 WL 260226, at *3–8 (N.D. Ill. Jan. 26, 2021) (citing *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020); *United States v. De La Torre*, 940 F.3d 938, 952 (7th Cir. 2019)).

acknowledges the seriousness of even a single sale of methamphetamine, his offense conduct is limited.

Furthermore, while methamphetamine is undoubtedly a scourge, the offense level attributable to this single drug sale is so significant because the Guidelines impose significantly enhanced offense level calculations for methamphetamine offenses compared to other serious drugs. Mr. Asbury was convicted of distributing 82.2 grams of methamphetamine, which is associated with a base offense level of 30. *See* U.S.S.G. § 2D1.1(c)(5). But a conviction for distributing the same amount of heroin or PCP would have resulted in a reduction of 8 levels—a base offense level of only 22; § 2D1.1(c)(9). A conviction for distributing the same amount of fentanyl or cocaine base would have resulted in a reduction of 6 levels—a base offense level of only 24. *Id.* § 2D1.1(c)(8). The comparatively enhanced base offense level for methamphetamine thus uniquely impacts the import of Mr. Asbury's conviction.

B.   **Chris Asbury's History and Characteristics Favor a Lower Sentence.**

Chris Asbury's history and characteristics are complex and often tragic. Chris was introduced to heavily addictive drugs at a very young age. As a child with limited parental oversight, one of Chris's middle school classmates took him in. Chris spent many days and nights at this friend's home. However, his friend's family members led the boys down a terrible path. When Chris was only 12 years old, his friend's father provided them both with alcohol, marijuana, and cocaine. *See* PSR ¶¶ 76–78. By the time he was 13, the friend's older cousin, who was around 17 or 18 years old, began to provide the boys methamphetamine. As a result, Chris was struggling with drug dependency even before he started high school. *See id.* ¶ 79.

It is harrowing that someone of Chris's age was provided with these highly addictive drugs. Growing up in an environment where drugs were readily available to children, it is perhaps unsurprising that Chris has struggled throughout his life with addiction. *See id.* ¶¶ 80–81. Over the

course of this lifelong struggle, Chris acquired an unfortunate and significant criminal history, which, on its face, reflects that addiction. *Id.*, Part B. Chris readily acknowledges these circumstances. However, like every other person, he is more than merely the sum of his arrests. Although not recorded in a rap sheet, Chris's many positive traits—like the love and loyalty he has had for his family and friends—must also factor into the Court's sentencing assessment.

Chris is a loving and supportive father. *Id.* ¶¶ 69–70. He and his life partner, Emily Ritchie, have a young son together, Benny, and Chris is also the father to two teenage children. *Id.* Before his arrest, Chris and Emily raised all three of Chris's children. *Id.* Raising kids with Emily has been Chris's life's joy. Even after his arrest, Chris has maintained consistent contact with his family as he has struggled to stay involved and engaged in their lives. *Id.* Chris has tried to call his children consistently throughout his incarceration, and he has continued to support them to the best of his ability. As Emily wrote in her letter to the Court, "Chris has always been a good dad. I miss him being here to help raise his son. He also has two other kids that need him. He was always putting his kids first and doing anything and everything he could for them" D.E. 58 at 6. That love and commitment is similarly reflected in the letter of his daughter, Isabella, who wrote to the Court about how her father always "ma[d]e sure my siblings and I had good grades" and "made sure we had everything we needed." *Id.* at 16.

Chris's efforts as a father and partner did not go unnoticed; they were known to his community. His friends and family are quick to explain that Chris's identity is wrapped up in parenthood. As his friend, Gabriella Waltz, wrote to the Court, "In the [four years] I've known Mr. Asbury I've seen the loving and caring man he is, he is not only a good friend but an amazing father to his children. . . . [H]e is always involved in school work and making sure they can reach their full potential. The light up in these children's eyes when they are around their father is

radiant." *Id.* at 1. Chris has always taken pride in his children and loves to introduce them to his friends and coworkers. A former coworker, Christine Marchant, wrote to the Court, "[Chris and I] became friends outside of work, where I was able to meet his children. He was such a great dad. His children love him very much. One of which is not biological, but that never mattered to Chris. He loves him as if he was his own, unconditionally." *Id.* at 13. Chris's love for Emily and his children is absolutely central to his character.

Chris has also been a generous and helpful member of his community. The letters presented to the Court provide accounts from friends and community of Chris's selfless attitude. He was known throughout that group as a man who would drop what he was doing to help out his friends and neighbors, even when there were no tangible benefits. Chris's youngest sister, Kathryn Anderson, writes that "[h]e is the type of person that will help someone (friend or family) when they are in a time of need. . . . [H]e has helped many of [his] friends whether it be finances, a place to rest their heads, or if they just need an ear to listen." *Id.* at 3.

For example, as Ms. Waltz recounted, Chris provided extensive support to another friend who was battling cancer by "helping him around the house," "helping him get to doctor's appointments," and even "helping to organize a benefit to help in order for him to get the proper treatment he needed." *Id.* at 1. Chris was also known for supporting friends and neighbors financially when he was able and for providing friends with food when they were struggling to feed themselves and their families. Chris's friend, Haylee Felgenhaure, witnessed these behaviors firsthand and wrote to the Court, "While being around Chris everyday I got to see all the great things he did. Especially all the acts of kindness he did for people. He went above and beyond for people who wouldn't even lift a finger for him. Whether it was paying someone's bills, filling someone's fridge with groceries, ends car rides [sic], to even taking the clothes or shoes off his

back or feet to give to another who needed it more." *Id.* at 18. In short, Chris's friends and neighbors know that he has been and can be a "positive force" in his community. *Id.* at 17. Chris's natural outlook is an asset and an important aspect of his character.

Although Chris's early struggles with addiction led him to drop out of high school, as an adult, he has demonstrated a desire to educate himself. He pursued and earned his GED and an auto mechanic certificate while incarcerated. PSR ¶¶ 85–86. Before his arrest in this case, Chris had enrolled in classes at Lake Land College, a community college in Mattoon, Illinois. PSR ¶ 72, 87. Chris has acknowledged his struggles with addiction and participated in substance abuse programming. When Mr. Asbury was around seventeen years old, he completed a six-month residential program with the Gateway Foundation. *Id.* ¶ 80. More recently, he has participated in six months of outpatient treatment with Hour House. *Id.* ¶ 81. And in 2017, Chris attended monthly alcohol abuse counseling at the Human Resource Center in Paris, Illinois.

As the Court noted in his prior sentencing, Chris is "a man who was trying to make his life better" and "was taking steps to do so." *Id.* at 39:12–15. Despite the prospect of an exceedingly lengthy sentence, those efforts have continued since Chris's arrest, through his initial sentencing, to the present day. Chris has enrolled in and completed various programming opportunities at Macon County Jail and at FCI Greenville, where he currently resides. He has participated in Alcoholics Anonymous and completed all modules of the Helping Men Recover Program. *See id.* ¶ 82; D.E. 58 at 7–11. While at FCI Greenville, he has completed the Drug Abuse Education Course and the Money Smart Course.[2]

---

[2] Supporting documentation showing Chris's participation and enrollment in the courses and programming referenced herein have been provided to the Probation Office for inclusion with the PSR.

Chris has enrolled in or joined the waiting list for several other programs, including drug education courses, an anger management course, a brain health course, and a "criminal thinking" course. More recently, he has joined a sewing apprenticeship program that was developed in conjunction with the U.S. Department of Labor. And perhaps most importantly, Chris has maintained his sobriety and has received no sanctions since his incarceration for the present offense. *See* PSR ¶ 125. This evidence of Chris's recent efforts to improve himself and change his trajectory are important and properly considered mitigating circumstances now. *See Pepper*, 562 U.S. at 505.

Chris remains committed to his own self-improvement. He understands and accepts that many years will pass before he is released from custody; but when that day comes, he wants and intends to start anew. There will be some lost years. But Chris hopes that there will be a life ahead in which he can still make a positive difference for his family, friends, community, and himself. Chris wants to be drug free, maintain a job, support his family, and atone for mistakes made. Even through his addiction, Chris has always tried to be a loving parent to his children. *See* PSR ¶¶ 70–71. While Chris knows that time apart will strain those relationships, he is adamant about maintaining his bond with his children. *See* D.E. 58 at 5, 16.

Chris recognizes that the Court cannot evaluate his history and characteristics without accounting for his criminal history. During his previous sentencing, the Government referred to that history as a reason to impose a substantial sentence. Respectfully, the Government's description of the Guidelines calculation of that criminal history was overstated. It is now undisputed that the correct calculation of Mr. Asbury's criminal history is 21 points—a 13-point reduction from the calculation upon which the Government relied in its prior argument. *See* PSR ¶ 49. Furthermore, of those 21 points, *seven* points—a third of the total—are attributable to

vehicular offenses; namely driving after the revocation of his license. PSR ¶¶ 46–48. Finally, all the remaining offenses that factor into Mr. Asbury's criminal history calculation are aged—from 2013 or earlier—and reflect his struggles with drugs.

Mr. Asbury acknowledges that under any circumstances, his Guidelines calculation places him in Criminal History Category VI and that he has many other offenses that are not included in his criminal history calculation. However, contrary to the Government's prior argument, Mr. Asbury's criminal history does not independently necessitate lengthy incarceration. Although that criminal history is rightfully considered by this Court as part of its evaluation of Mr. Asbury's past, it is already properly accounted for in his advisory Guidelines calculation and should also be viewed in the context of Chris's struggle with substance abuse.

Finally, it is clear that Mr. Asbury's arrest, conviction and initial sentencing in this case have been a serious and life-altering wake-up call. Chris's ongoing efforts to improve himself and stay sober are strong evidence that a more measured sentence of no more than 150 months is appropriate.

**IV.    Any Sentence of More Than 150 Months Would Be "Greater Than Necessary" and Would Not Be a "Just Punishment."**

Section 3553(a)(2)(A) provides that the sentence imposed should "reflect the seriousness of the offense," "promote respect for the law," and provide "just punishment." A sentence of 150 months' incarceration is sufficient to achieve those goals.

At Mr. Asbury's initial sentencing, the Court stated:

> [T]he sentence needs to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. In this case, that's—I mean, with the guideline range, even if I'm wrong, of 30 years to life and the statutory range of 15 years to life, no matter what, it's a sentence that would reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

*See* D.E. 75 at 40:17–41:2. Notably, the Court's analysis at that time was based on the assumption that Mr. Asbury was responsible for relevant conduct and a miscalculation of his criminal history points. Yet, even then, the Court indicated that a fifteen-year sentence would have been sufficient to achieve the goal of imposing punishment. *Id.*

A sentence above fifteen years would not be just. The Court's sentence should not be so lengthy that it would prevent Mr. Asbury from an opportunity to lead a meaningful and productive life. The requested sentence of 150 months, on the other hand, is more than just punishment for a single drug sale of 82.2 grams of methamphetamine, for which Mr. Asbury has been convicted. That sentence would "reflect[] the seriousness of the offense," "promote[] respect for the law," and provide "just punishment." A sentence that would keep him incarcerated any longer, into his late 50s or beyond, would be excessive.

V.     **A 150-Month Sentence Affords Adequate Deterrence and Protects the Public**

Section 3553(a) requires the Court to impose a sentence that will provide adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) & (C). The Court's previous pronouncements in Mr. Asbury's original sentencing addressed this consideration:

> The sentence imposed should afford adequate deterrence to criminal conduct. Well, there's no doubt in my mind that any sentence I impose within the statutory range or the guideline range—but, more importantly, within the statutory range—would adequately deter Mr. Asbury from committing any further conduct. He's 40 years old at this time. Even if I were to impose the statutory mandatory minimum [of 15 years], he would not be out until he was in his early 50s. Likewise, I am to protect the public from further crimes of the defendant. The defendant will be out of commission for a lengthy period of time.

*Id.* at 41:3–14.

Mr. Asbury is now forty-one years old, militating against an overly long term of incarceration. Even with a statutory minimum ten-year sentence, Mr. Asbury would remain in

prison until he was nearing his 50s. The U.S. Sentencing Commission has studied the issue and has found that older defendants are less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed.[3] A sentence of 150 months will therefore provide adequate deterrence—it is a serious and deterrent sentence—and will protect the public because Mr. Asbury's risk of recidivism will be even further lessened at his age on release—particularly in light of his self-improvement and sobriety efforts.

## VI. A 150-Month Sentence Would Avoid Unwarranted Sentencing Disparities

As this Court explained in Mr. Asbury's previous sentencing, "it is important [to] avoid unwarranted sentencing disparities among defendants who have been engaged in *similar type conduct*." D.E. 75 at 42:5–8 (emphasis added). The U.S. Sentencing Commission's most recent data report reveals that the average sentence length for methamphetamine drug trafficking offenders over the last five years is between 87–97 months.[4] In this case, the conduct at issue is a single 82.2-gram drug transaction involving methamphetamine. Given that the offense conduct is that limited, it would be unwarranted to sentence Mr. Asbury to a substantially lengthier term of imprisonment. Mr. Asbury recognizes that defendants with greater criminal history categories receive greater sentences, and that acknowledgement is accounted for in his request for a 150-month sentence. Anything greater than that, however, would be so high above the average sentence for methamphetamine trafficking offenses as to be incongruent with the punishment received by others.

---

[3] *See* U.S. Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, Dec. 2017, at 3, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

[4] *See* U.S. Sentencing Commission, Quarterly Data Report, FY22 Second Quarterly Sentencing Update, June 14, 2022, at 35, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_2nd_FY22.pdf

**VII.    Mr. Asbury's Sentencing Request**

For the reasons stated above, Mr. Asbury respectfully requests that the Court impose a sentence of no more than 150 months' incarceration, no greater than ten years' supervised release, and no fine or restitution. This sentence is "sufficient, but not greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a).

Chris Asbury's longstanding focus on his family and community, his delayed but consistent pursuit of an education, and his post-sentencing conduct and rehabilitation are strong evidence that this case—Mr. Asbury's first federal prosecution—has been a transformative experience and a turning point in Chris's life. Chris Asbury respectfully requests the Court recognize these factors in imposing sentence.

DATED this 2nd day of July, 2022.

FAEGRE DRINKER BIDDLE & REATH LLP

/s/ *David Yoshimura*
David Yoshimura
Faegre Drinker Biddle & Reath LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
(515) 447-4738
Email: david.yoshimura@faegredrinker.com

*Attorney for Defendant Christopher L. Asbury*

13 | P a g e

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 2, 2022, the foregoing **SENTENCING MEMORANDUM** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was thereby served on all parties.

                                      /s/ David Yoshimura